Filing # 259020329 E-Filed 10/12/2026 04:08:22 PM

IN THE CIRCUIT COURT OF THE 12TH JUDICIAL CIRCUIT IN AND FOR SARASOTA COUNTY, FLORIDA

J.G., and A.M.,

Plaintiff,

v.

SHREE SAINATH HOSPITALITY, LLC,
a Florida limited liability company,

Defendant.
_____________________________________/

CASE NO.______________

# COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, J.G., and A.M., by and through undersigned counsel, hereby file their Complaint against Defendant, SHREE SAINATH HOSPITALITY, LLC d/b/a Days Inn, and as grounds therefore state as follows:

## I. INTRODUCTION

1. This is an action for damages in excess of Fifty Thousand Dollars ($50,000.00).

2. Plaintiffs, J.G., and A.M. file this lawsuit under 18 U.S.C. 1591(a), and 1595(a) of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, seeking compensation for the harms they suffered when they were forcibly and serially sex-trafficked, often together, from 2015 through 2022 ("trafficking period"), at this Days Inn located at



Filed 10/12/2026 05:36 PM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

5774 Clark Road, Sarasota, FL 34233 owned, operated, maintained, and controlled by Defendant, Shree Sainath Hospitality, LLC, through their owners, managers, employees and agents during the trafficking period.

3. From 2015 through 2022, Plaintiffs, just 21 (J.G.) and 26-years-old (A.M.) at the inception of the trafficking period, were serially and repeatedly sex trafficked, often together by their Trafficker and his associates at this specific Days Inn, typically for weeks at a time. Plaintiffs were trafficked at this Days Inn separate times, staying anywhere from a few days at a time to multi-week stays (because they were abducted, drugged, beaten and their possessions taken, the exact dates of each stay cannot be provided at this time but discovery will help make these dates more clear); throughout the trafficking period Plaintiffs stayed at this location over 50 times.

4. Defendant, Shree Sainath Hospitality, LLC, (collectively with their managers, employees and agents who, for the remainder of this Complaint, always acted in the course and scope of their employment and for the benefit of the hotel), owned and managed this Days Inn located at 5774 Clark Road, Sarasota, FL 34233, for all times relevant during the trafficking period.

## II. JURISDICTION, VENUE AND PARTIES

5. This Honorable Court has jurisdiction and venue over this matter because a substantial part of the events or omissions giving rise to the claims asserted in

this action occurred in Sarasota County, Florida and Defendant's primary place of business is in Sarasota County, Florida, at all relevant times, and the amount in controversy is over $50,000.00.

**a. Plaintiffs, J.G. and A.M.**

6. Plaintiffs, J.G. and A.M., submit to the jurisdiction of this Court.

**b. Defendant, Shree Sainath Hospitality, LLC**

7. Shree Sainath Hospitality, LLC., was a business incorporated in Florida that owned and operated the subject Days Inn from prior to the inception of the trafficking period until February of 2022, that was authorized and licensed to do business at its principal place of business in Sarasota County, in the State of Florida.

## III. FACTS DESCRIBING J.G. AND A.M.'S TRAFFICKING AT THIS DAYS INN

8. Hotels are the primary place where sex-trafficking occurs in the US today because they provide a non-traceable, low-overhead, low-risk venue for sex traffickers to operate.[1] For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[2]

[1] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking- usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[2] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

In 2014, for example, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[3] And hotels have been found to account for over 90 percent of commercial sexual exploitation of children.[4]

9. Congress passed the TVPRA specifically to combat sex trafficking and it chose to provide a civil remedy to victims like J.G. and A.M. against both perpetrators of sex trafficking, and those that merely benefited from sex-trafficking – directly targeting hotels in recognition to their contributions to the scourge of sex trafficking.

**a. J.G. and A.M. Meet Their Trafficker**

10. J.G. and A.M. survived years of forced sex trafficking, serially and repeatedly, often together from 2015 through 2022.

11. J.G. and A.M. were abducted by their trafficker when they were 21 and 26 years old, respectively.

12. Shortly after meeting the trafficker, he took all of J.G. and A.M.'s possessions and forcibly began selling them to complete strangers for sex, against their

---

[3] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[4] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

will, for the trafficker's profit (for the purposes of Plaintiffs' motion to proceed pseudonymously, this included particularized physical and mental violence and threats of violence against Plaintiffs and their families if either of them reported him).

13. For years, J.G. and A.M., were then repeatedly sold for sex to strangers by their trafficker; although various methods were used, their trafficker often beat one in front of the other to show them what happened if they did not obey.

14. During this time, whatever food, clothing and hygienic products J.G. and A.M. were given were provided by their traffickers and they often went without.

15. J.G. and A.M.'s traffickers forced them to fear for their lives.

16. J.G. and A.M.'s traffickers serially and repeatedly sold J.G. and A.M. as a sex slaves to buyers at this Days Inn as part of a commercial sex-trafficking venture.

17. J.G. and A.M. were raped while at this Days Inn by various "sex buyers," who paid their traffickers for the "right" to do so.

18. J.G. and A.M.'s traffickers took the commercial sex proceeds.

19. J.G. and A.M.'s traffickers used a portion of the proceeds from the commercial sex acts to book additional lodging at this Days Inn for additional nights.

20. Upon information and belief, J.G. and A.M.'s traffickers paid for then used this Days Inn's Wi-Fi networks to post advertisements for J.G. and A.M. to perform sex acts, and men would thereafter rape her because of these advertisements.

21. During stays at this Days Inn, J.G. and A.M.'s traffickers used Defendant's parking lot as a staging area and makeshift office for their sex-trafficking venture, as a place to collect money from the sale of J.G. and A.M., and as a place to communicate with Defendant, who cooperated with their traffickers in their trafficking.

22. In fact, Defendant had ample time and opportunity to recognize and intervene in J.G. and A.M.'s trafficking based on their many stays at this Days Inn throughout the years they were trafficked there, as described above, in paragraph 3.

23. J.G. and A.M.'s traffickers took sexually explicit photos and videos of them that were later used publicly in advertisements against their will.

24. As described in greater detail below, J.G. and A.M.'s traffickers controlled every aspect of their lives during the trafficking period: they took away their possessions, their money and IDs; they restricted their access to food, hygienic necessities, clothing, and sleep; they turned them into an objects of commerce by forcing then to wear a sexually explicit "uniform" of their choosing to

marking them as sex slaves who was always “on the clock”; they threatened them with extreme violence and death if they refused to comply with the sexual demands of complete strangers or if they attempted to disobey him; they drugged them; they constantly surveilled and physically restrained them; they would not let them speak on a phone without their supervision; simply put, they forced them to be subhuman slaves to be sexually exploited for the traffickers’ own profit with absolutely no regard to their wellbeing or humanity.

25. The indicia of being forcibly sex-trafficked at this Days Inn, on more than fifty occasions during the trafficking period were open and omnipresent.

26. In fact, J.G. and A.M.’s traffickers chose this Days Inn because it was a sex-trafficking-friendly hotel where they felt safe and confident they would receive special assistance and would not get caught.

27. Defendant was trained to identify the open and obvious signs that J.G. and A.M. were being forcibly sex trafficked and had policies to report sex trafficking.

28. In fact, prior to the inception of the trafficking period, Days Inn’s parent company, Wyndham Hotel Group, partnered with Polaris to develop comprehensive training and education tools for hotel owners and franchisees, property-level staff and employees at its corporate offices to educate them

about all aspects of human trafficking.[5]

29. Defendant eschewed both Wyndham Hotel Group's and their own policies requiring the reporting of J.G. and A.M.'s traffickers in favor of a policy to assist J.G. and A.M.'s trafficking by providing personalized support to them and sharing in the profits that they brought to the hotel.

30. In paragraphs 33-37, below, J.G. and A.M. recount the visible indicia of their sex-trafficking that Defendant should have observed at this Days Inn.

31. These indicia show Defendant knew (or should have known) J.G. and A.M. were being trafficked and that it chose to participate in the trafficking by providing personalized support to J.G. and A.M.'s traffickers.

32. The prevalence and obviousness of J.G. and A.M.'s trafficking indicia illustrates that Defendant purposely created a safe space for trafficking at this Days Inn; the personalized support services Defendant provided to J.G. and A.M.'s traffickers illustrate a de facto policy of assisting traffickers to keep the rooms filled, in spite of its knowledge that sex trafficking was occurring at the hotel.

33. Some of the obvious indicia of trafficking included (this is not an exhaustive list):

    a. J.G., A.M. and their traffickers were consistently allowed to pay for

[5] https://polarisproject.org/press-releases/wyndham-hotel-group-partners-with-polaris-to-help-prevent-human-trafficking/

rooms with cash or prepaid credit cards, sometimes refused and eventually were not required to provide identification and typically paid daily, even when long-term guests at this Days Inn;

b. J.G., A.M. and their traffickers checked into this Days Inn with few possessions and rarely had any bags – even on long term stays;

c. J.G. and A.M. were always dressed in sexually explicit clothing in common areas in and around the hotel, and were almost never seen in anything but a few suggestive outfits, wearing the same suggestive outfit over and over again;

d. Defendant interacted with, observed and permitted J.G. and A.M. to solicit men for sex throughout the hotel's premises even near the front desk while employees were present, always in explicit clothing which was against hotel policy (and the law);

e. Defendant observed and permitted J.G. and A.M. to have sexual interactions with men in their vehicles in this Days Inn's parking lot;

f. A constant stream of sex buyer – typically up to 25 a day – without luggage, came and went from J.G. and A.M.'s rooms usually for 20-minute stays, often passing through the view of Defendant

g. J.G. and A.M.'s traffickers declined housekeeping at this Days Inn and rarely allowed Defendant into their rooms;

h. J.G. and A.M.'s room always showed signs of sex trafficking – sex and drug paraphernalia, syringes, condom boxes, condoms in the trash cans, and it was messy and unclean from denying housekeeping for long periods; Defendant observed these signs on the occasions they went into their room and upon turning the room over;

i. J.G., A.M., and their traffickers constantly requested and often took additional towels and sheets in plain sight of housekeeping or the front desk at all times of the day or night and could frequently be seen taking out their own trash; sheets were consistently soiled with bodily fluids and sometimes blood from being beaten, from being forced to have sexual relations while menstruating or as a side effect of forced intravenous drug use;

j. J.G. and A.M's traffickers loitered in this Days Inn parking lot all day and night while they made frequent trips to the parking lot to deposit cash after each sex buyer;

k. There were typically at least three women being trafficked by J.G. and A.M's trafficker making the signs more obvious and ubiquitous then if there was just one girl.

34. The traffickers threatened harm against J.G. and A.M. and their families; they intimidated them with references to people they had previously hurt; and they openly used physical force against them, the consequences of which was often visible (this is not an exhaustive list) to Defendant:

a. J.G. and A.M.'s traffickers frequently yelled at and struck J.G. and A.M. in common areas of this Days Inn, often in front of Defendant;

b. J.G. and A.M. usually displayed clearly visible signs that they was being abused and forced against their will to comply with traffickers, including visible bruising, cuts, scrapes, scratches, welts, red marks, bruises, cut lips, exhaustion, poor hygiene, fatigue, sleep deprivation and signs of drug use;

c. On one occasion, there was an issue brought to their attention by the front desk clerk regarding checking into a room under one of the Plaintiff's names; Plaintiffs were arguing back and forth about how they were going to get beaten by their trafficker if they were unable to get a room; this conversation occurred in front of the front desk clerk who was a younger man who appeared to Indian; their trafficker appeared and he then let them check into the room;

d. J.G. and A.M. endured frequent beatings at this Days Inn from their traffickers and sometimes by sex buyers and they were forcibly trafficked even while menstruating; additionally, ruptured veins from drug use resulted in blood frequently being visible in their hotel rooms, on sheets (especially when turning over the room), and sometimes on their bodies; Defendant never reported or asked if they were ok, even

when they saw them bleeding or upon turning over a room with their bloody sheets;

e. Defendant was within earshot of J.G. and A.M. many times when loud noises came from her room from disputes or physical violence by sex buyers or her traffickers;

f. A.M. chased a sex buyer out into the lobby of the hotel after he took her trafficker's money back; A.M. was completely naked and the sex buyer was shirtless; she chased him through the lobby, in front of multiple employees, yelling that her traffickers were going to beat her if she didn't give him the money, yet no employees intervened and they continued to allow her traffickers to rent rooms there;

g. J.G. and A.M.'s Traffickers engaged in a deadly pattern of drug dependency coercion with J.G. and A.M.; the traffickers provided drugs and then withheld them to manipulate, control and incapacitate them; they frequently showed signs of disorientation and impairment;

35. J.G. and A.M. also recall Days Inn personnel consistently providing personalized support to her traffickers throughout the entire trafficking period:

a. Defendant looked out for Plaintiffs' traffickers and provided them with vital information and warnings when law enforcement was approaching or when customers complained about them so they could stop the trafficking and conceal them temporarily until it was safe to resume operations;

b. Defendant informed Plaintiffs' traffickers when they left or looked like they were going to leave the hotel property upon request by their traffickers;

c. Defendant warned Plaintiffs' traffickers when there was too much activity or noise coming from their room(s);

d. Defendant placed Plaintiffs in an area to avoid detection from complaining guests or police upon request by Plaintiffs' traffickers so they could remain clandestine;

e. Plaintiffs never had their IDs, but this Days Inn occasionally unlocked their door for them when they were inevitably locked out, upon request by their traffickers, without having to show ID;

f. Defendant provided Plaintiffs' traffickers with discounts and, on occasion, free rooms;

g. Plaintiffs' traffickers openly sex trafficked them at this Days Inn often in front of Defendant without issue, even though this was against policy (and was illegal);

h. Plaintiffs' traffickers were friendly with Defendant and had conversations with their employees– often for long periods of time – even upon checking in; these conversations made it clear that Plaintiffs' traffickers were friendly with staff and management, and likely had trafficked other girls at this Days Inn before Plaintiffs;

i. Plaintiffs' traffickers frequently made it clear to Plaintiffs that this Days Inn was a preferred hotel because it was a "safe" space to traffic them, they knew personnel there, and they would get the type of assistance described above and that was why they continually stayed at and returned to this particular Days Inn;

j. Plaintiffs' traffickers openly tipped housekeeping for information and for ignoring their trafficking, which was counterintuitive since housekeeping was usually not allowed into their room to perform housekeeping duties.

l. Defendant strategically placed J.G. and A.M. in rooms away from the front so that other guests would not see them upon check-in and placed them where guests were less likely to complain about the noise and obvious signs of trafficking;

36. Defendant continued to rent rooms to J.G. and A.M.'s traffickers even though they were aware they were trafficking them:

a. Defendant continued to rent rooms to Plaintiffs' traffickers despite the indicia, above, showing they had actual and constructive knowledge that they were being trafficked;

b. Plaintiffs' traffickers spent large sums of money on rooms; Days Inn accepted this money even though it knew they were being trafficked by traffickers.

c. Defendant had a policy of providing special rates to Plaintiffs' traffickers as incentive to book more nights at this hotel;

d. Defendant continuously renewed their business relationship with J.G. and A.M.'s traffickers over the trafficking period by re-renting rooms to them despite their actual and constructive knowledge they were being forcibly sex-trafficked at their hotel.

37. Publicly available complaints found on Google about this Days Inn illustrate that if even casual short-term guests could see prostitution and signs of violence, surely Days Inn was in a position to know it was happening. In fact, Defendant responded to several reviews, indicating it had awareness of the complaints

a. "They allow people to run/yell/fight all through the hallways at mid hours of the night."

b. "Worst experience ever! Room was nice but I guess there's a lot of prostitution between the 2 hotels…"

The owner responded stating: We are so sorry to learn about this incident during your recent stay. This is certainly not taken lightly and has been forwarded to management for review. Providing our guests with an enjoyable experience is of extreme importance to us and for that reason we are incredibly sorry that we missed the mark. We hope to earn your business on future travels so that you can see our continuous improvement.

c. "[F]elt like I was in the trap house."

The owner responded stating: "We appreciate that you have taken the

time to share your recent experience and find this very distressing. Our primary goal is always to provide our guests with an enjoyable experience. For that reason, we certainly take this very seriously and have forwarded it to management. We appreciate that you've taken the time to leave advice for our future guests."

d. "Stayed two nights first night 8 rooms where rented to a group they partyed [sic] most of the night at about 3 in the morning two women where fighting out side our door. Never sleep that night to [sic] loud That morning the parking lot was a mess the pool was littered with trash and food, people had been sitting on the hood of our car. went to the front desk was told they could not reimburse or take responsibility for that night. They offered a discount for our next visit to Sarasota we checked our next trip to town discounted price was the same as we paid a month earlier discount of inflated price My advise go somewhere else or sleep in your car"

e. "Pure hell. Booked for 4 nights and barely slept all 4 nights. Full of reimbursed homeless people with screaming kids banging on walls while their 'parents' get coked up. I asked them politely to quiet down, they gave me the F-U. Do NOT stay here!"

f. "One of the worst, nastiest hotels I've ever stayed in. The daytime manager was an old rude man who told us that blood and urine stains on the bed on the sheet were the 'norm' completely disgusting."

g. "The bed sheets had dried blood on them and we had to ask for a clean set."

h. "Disgusting. Mattresses looked like a crime scene. Woman's underwear stuck between mattress and wall…"

The manager responded stating: "Hello Christopher, Thank you for alerting us to a potential pest problem. We are investigating and treating to make sure that this is an isolated incident. I assure you that we have strict guidelines we follow, and cleanliness issues are very important to us and are being addressed immediately with our staff. We are always looking for ways to improve upon the guest experience and I hope you will return to see how we continue to grow and evolve."

i. "- Blood stains on the carpet
- Mysterious stains on the walls ??? ( I'm sure you can guess )…
- Stains on the sheets (sheets were so bad we went to target and bought sheets just so we could have some peace of mind while sleeping)… #1 Update: The Manager reached out to me regarding my stay at the hotel. He was very sorry about the bad stay and comped one of the nights because of the issues we had."

38. The above factors illustrate that Defendant was far from merely a passive actor indifferently renting rooms to J.G. and A.M.'s traffickers the same way they rented to other hotel guests in arm's-length transactions; taken together, these indicia show Defendant had purposely crafted sex-trafficking-friendly policies so their rooms were filled with the type of cash-paying, longer term "guests" that trafficking brought to the hotel; the indicia also show that the acts of hotel employees were not rogue actions by opportunistic grifters but carefully curated by Defendant to cultivate a safe space for sex traffickers for the profit they brought to the hotel.

## IV. EMPLOYEES ACTED WITHIN SCOPE OF EMPLOYMENT FOR BENEFIT OF DAYS INN

39. All of Defendant's ownership, staff, employees, management, agents and rank and file employees of this Days Inn and their acts described throughout this Complaint occurred in the course and scope of their employment specifically and explicitly for the benefit of their employers and of the hotel.[6]

[6] The TVPRA permits agency liability. *Doe v. Hotels,* 2024 WL 2955728, at *5 (M.D. Fla. 2024)

40. The actions and knowledge of Defendant, including their ownership, staff, employees, management, agents and rank and file employees, are taken within the course of their employment for Defendant's benefit, are imputed to the Defendant. *Doe v. Hotels*, 2024 WL 2955728, at *5.

41. The employees and their acts described throughout this Complaint occurred during regular hours of employment, on the premises, while they were on duty, and within their job duties, without force or coercion and with an intent to further the employer's interests of creating a trafficking-friendly hotel so this Days Inn could be as profitable as possible, including accepting trafficking money in exchange for renting rooms to J.G. and A.M.'s traffickers.

**COUNT I – PERPETRATOR LIABILITY AGAINST DEFENDANT**

42. Plaintiffs, J.G. and A.M. hereby adopts and re-alleges each and every allegation in paragraphs one through forty-one and further state:

43. J.G. and A.M. are victims of sex trafficking within the meaning of 18 U.S.C §1591 and are thus entitled to bring a civil action under 18 U.S.C §1595

(citing *Treminio v. Crowley Maritime Corp.,* 649 F.Supp.3d 1223, 1232 (M. D. Fla. 2023), 649 F. Supp. 3d at 1232 (collecting cases and declining to dismiss TVPRA claim against corporation for violative acts of its employees)). An employer can be held liable for the tortious or criminal act of an employee if the act was committed during the course of employment to further a purpose or interest of the employer. *Id.* (citing *Doe v. St. John's Episcopal Par. Day Sch., Inc.*, 997 F. Supp. 2d 1279, 1287–88 (M.D. Fla. 2014)).

against a "perpetrator" for any violation of the TVPRA.

44. Perpetrator liability is defined in 18 U.S.C § 1591(a) of the TVPRA.

45. This section criminalizes two different sets of actions for any entity that knowingly:

> (1) recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or
>
> (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or...in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act[.] 18 U.S.C. §1591(a)

46. For the purposes of the present suit, hotels can be found *civilly* liable under the TVPRA for violating the *criminal* law defined in § 1591(a) by either 1) harboring or maintaining a sex trafficking victim; or 2) benefitting financially from "participating in a venture" that harbors a sex-trafficking victim in "reckless disregard" of her forced sex trafficking.

47. The TVPRA provides that "[a]n individual who is a victim of a violation of this chapter [§ 1591(a)] may bring a civil action against the perpetrator[.]" 18 U.S.C. § 1595(a). A perpetrator is "someone who has violated the criminal statute." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021).

48. Perpetrator liability under the first avenue of the criminal statute, § 1591(a)(1), requires Plaintiffs to show Defendant "harbored" or "maintained" them for

sex trafficking.

49. Providing lodging to J.G., A.M., or their traffickers for the purposes of obtaining their labor or services against their will constitutes "harboring" under the TVPRA. *Doe v. Hotels,* 2024 WL 2955728 at 20-21.

50. Alternatively, perpetrator liability under the second avenue of the criminal statute, § 1591(a)(2), requires Plaintiffs to show Defendant benefited financially by participating in a "venture" with their trafficker in reckless disregard of the fact that they were being forcibly sex trafficked.

51. In § 1591, "[t]he term 'venture' means any group of two or more individuals associated in fact[.]" 18 U.S.C. § 1591(e)(6).

52. "Participation in a venture" under § 1591, means that a defendant must have had knowledge that when it rented a room to J.G., A.M., or her traffickers, it was assisting, supporting, or facilitating her traffickers in their violations of § 1591(a). *Doe v. Rajveer LLC*, No. 2:24-cv-00175-RAH, 2025 LX 127352, at *13-14 (M.D. Ala. Mar. 25, 2025).

53. Because Defendant provided lodging to J.G. and A.M.'s traffickers for the purposes of obtaining their labor against their will, Defendant is liable under § 1591(a)(1); additionally, because Defendant participated in a venture with their traffickers in reckless disregard of the fact that they were being forcibly trafficked, Defendant is liable under § 1591(a)(2).

**1) Defendant Harbored J.G. and A.M. Under § 1591(a)(1).**

54. Defendant is a perpetrator within the meaning of 18 U.S.C §1591(a)(1) because they harbored J.G. and A.M.

55. Defendant harbored J.G. and A.M. because they provided rooms to their traffickers for the purpose of obtaining their labor against their will.

56. Defendant's act of renting rooms to their traffickers for J.G. and A.M.'s forced labor can be distinguished from their renting to ordinary, arm's-length customers in several ways:

   a. Defendant was already participating in a venture with J.G. and A.M.'s traffickers (as described below). Defendant, therefore, knew they were trafficking J.G. and A.M. and knew that renting rooms to their traffickers would lead to their continued cash patronage and extended stays because their stays were exclusively based on the known, forced labor of J.G. and A.M., not the occasional vacation or work conference of an ordinary, non-trafficking renter (the length and frequency of ordinary renters' stays did not rely on forced labor).

   b. Every time Defendant provided discounts and free rooms to J.G. and A.M.'s traffickers, they eschewed the Days Inn's stated business of renting rooms and participated in a venture that included sex trafficking J.G. and A.M.

c. Defendant provided J.G. and A.M.'s traffickers with free and discounted rooms in hopes that J.G. and A.M.'s continued trafficking would provide incentive for their traffickers to return to this Days Inn and extend their stays, resulting in increased cash profit.

57. By continuing to rent rooms to J.G. and A.M.'s traffickers after learning they were trafficking J.G. and A.M., Defendant was, by definition, knowingly harboring them for sex-trafficking, and this was confirmed every time Defendant provided personalized services to their traffickers.

**2) Defendant Benefited by Participating in J.G. and A.M.'s Forced Trafficking.**

58. Defendant is a perpetrator within the meaning of 18 U.S.C §1591(a)(2) by benefitting financially from participation in a venture with Plaintiffs' traffickers in reckless disregard of the fact that they were being forcibly sex trafficked.

59. Paragraph 36, above, alleges Defendant benefited financially from renting rooms to J.G. and A.M.'s traffickers.

60. Paragraphs 33-37, above, allege sufficient indicia of J.G. and A.M.'s trafficking that Defendant had at least reckless disregard of the fact that their traffickers were trafficking (them).

61. Paragraph 35(a)-(l), above, alleges that Defendant provided personalized support to J.G. and A.M.'s traffickers (in furtherance of a venture between

them).

62. Paragraphs 33-37, above, but especially 33(a)-(k) and 35(a)-(l), allege Defendant was aware that J.G. and A.M.'s traffickers used force to traffic them.

63. Taking these paragraphs together, Defendant had *at least* reckless disregard that J.G. and A.M.'s traffickers were *forcibly* sex trafficking them *against their will* (realistically they had actual knowledge of the trafficking and participated in it with their traffickers to increase profits).

64. Defendant, therefore, knowingly harbored Plaintiffs with actual knowledge or reckless disregard of the fact that force, threats of force, or coercion would be used to force Plaintiffs to engage in commercial sex acts. Defendant is therefore liable for "harboring" Plaintiffs under the TVPRA. *Doe v. Hotels,* 2024 WL 2955728 at *8.

65. As a direct and proximate result of the above egregious acts of Defendant, J.G. and A.M. have been permanently injured and damaged physically, emotionally, psychologically, and financially.

WHEREFORE, Plaintiffs J.G. and A.M. demand judgment for damages against Defendant, SHREE SAINATH HOSPITALITY, LLC, in an amount in excess of Fifty Thousand Dollars ($50,000.00), costs, interest, attorneys' fees, if allowable by law, and such other and further relief as the Court deems just and proper, both

in law and in equity. Plaintiffs further demand trial by jury as to all issues triable as a matter of right to a jury.

## **COUNT II – BENEFICIARY LIABILITY AGAINST DEFENDANT**

66. Plaintiffs, J.G. and A.M., hereby adopts and re-alleges each and every allegation in paragraphs one through forty-one and further state:

67. All paragraphs within this count apply to Defendant, Shree Sainath Hospitality, LLC, but only during its period of ownership of the subject Days Inn, from the inception of the trafficking period until February of 2022; the same trafficking-friendly policies described in detail throughout Part III, above, persisted, consistently throughout the entirety of the trafficking period, from 2015 – 2022, including throughout Shree Sainath Hospitality, LLC's period of ownership, from prior to 2015 – 2022.

68. J.G. and A.M. were victims of sex trafficking within the meaning of 18 U.S.C. § 1591 and Defendant was a "beneficiary" of their sex trafficking within the meaning of the 18 U.S.C. § 1595(a).

69. For the sake of this suit, § 1595(a) does two things: it provides a civil remedy against hotels in violation of the criminal statute, § 1591(a) and, additionally, it provides an avenue for liability against hotels who are "beneficiaries" of sex trafficking (who may or may not also be criminally liable under § 1591(a)).

70. Section 1595(a) states:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees. 18 U.S. Code § 1595(a)

71. To establish a beneficiary claim under § 1595(a), J.G. and A.M. must allege that Defendant (1) knowingly benefited (2) from participating in a common venture involving risk and potential profit, (3) that the venture violated the TVPRA, and (4) that Defendant had constructive or actual knowledge that the venture violated the TVPRA. *A.M. V. Northbrook Industries, Inc.,* No. 25-10816, at 21-22 (11th Cir. Mar. 30, 2026).

72. J.G. and A.M. have alleged that Defendant was a beneficiary under § 1595(a) because they have alleged that they knowingly benefited from providing personalized support to their traffickers with (at least constructive) knowledge that they were trafficking them at this Days Inn and nonetheless continued to rent rooms to them in spite of that knowledge.

**a. <u>Element 1: Defendant Knowingly Benefited from J.G.'s Sex Trafficking.</u>**

73. The first element of a beneficiary claim under § 1595 requires J.G. and A.M. to allege that Defendant "knew it was receiving some value from participating in the alleged venture." *Doe #1 v. Red Roof Inns*, 21 F. 4th at 724. For this

element, the Court is only concerned with whether a defendant knowingly benefited from the trafficking enterprise – either "financially or by receiving anything of value." *Id.*

74. Under § 1595, "knowingly benefited" requires alleging Defendant profited by renting rooms to J.G. and A.M.'s traffickers, whom they knew or should have known were trafficking J.G. or A.M.

75. J.G. or A.M. may establish a Defendant knowingly benefited by "repeatedly renting rooms that defendant knew or should have known were being used for sex trafficking." *Doe v. Hotels,* 2024 WL 2955728, at *7 (citing *A.D. v. Holistic Health Healing Inc.*, 2023 WL 3004546, at *3 (M.D. Fla. Apr. 19, 2023)).

76. A hotel's receipt of revenue from room rentals is a financial benefit from a relationship with a trafficker sufficient to satisfy the first element of the TVPRA. See *Does 1-4 v. Red Roof Inns, Inc.*, 688 F.Supp.3d 1247, 1253-54 (N.D. Ga. Aug. 10, 2023) (receipt of room rental revenue constituted a "benefit" under § 1595(a)).

77. It has been set forth above in detail, (especially in paragraphs 36(a)-(b)) that Defendant knowingly received rental revenue from J.G. and A.M.'s traffickers and knew or should have known that J.G. and A.M. was being sex trafficked (paragraphs 33-37).

78. J.G. and A.M., therefore, have sufficiently pleaded that Defendant knowingly benefited by renting rooms to J.G. and A.M.'s traffickers with knowledge they were sex trafficking at this Days Inn.

b. **Element 2: Defendant Participated in a Venture with J.G. and A.M.'s traffickers.**

79. To establish the second element of a TVPRA beneficiary claim, J.G. or A.M. must plead facts showing Defendant knowingly benefited "from participating in a venture," under the lower standard established in § 1595 see *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 724.

80. In sharing its interpretation with the D.C. Circuit, the 11th Circuit Court of Appeals "defines participation in a venture as 'taking part or sharing in an enterprise or undertaking that involves danger, uncertainty, or risk, and potential gain.'" *Northbrook* at 17 (quoting *Doe 1 v. Apple, Inc.*, 96 F.4th 403, 415 (D.C. Cir. 2024).

81. Under § 1595, the "venture" is not required to be primarily a sex trafficking venture although it must violate the TVPRA in some capacity. *Northbrook* at 20.

82. And although pleading "participation in a venture" with a sex-trafficker requires alleging "something more" than merely "arms-length," "passive," or "largely indifferent" relationships, alleging that a hotel offered "personalized support" to a sex trafficker is sufficient to show it

"participated in a venture" with a trafficker under § 1595. *Id.* at 19-20.

83. In the present case, Defendant's relationship with J.G. and A.M.'s traffickers was far from indifferent or passive or reflective of merely renting rooms to them through arm's-length transactions.

84. In addition to alleging that Defendant had at least constructive knowledge of J.G. and A.M.'s trafficker's forceful trafficking of J.G. and A.M. (paragraph 32), and in addition to alleging Defendant had eschewed their policies against trafficking in favor of policies that created a trafficking-friendly hotel (paragraphs 26,38,41), J.G. and A.M. have also alleged that Defendant provided J.G. and A.M.'s traffickers with personalized support in furtherance of their trafficking in paragraphs 35(a)-(l).

85. Plaintiffs also satisfy this element by alleging "a 'continuous business relationship' between a defendant hotel and a sex trafficker where the defendant rented rooms to people it knew or should have known were engaged in sex trafficking." *Doe K.R. v. Choice Hotels*, No. 6:23-cv-1012-JSS-LHP, 2024 U.S. Dist. LEXIS 104200, at *25 (M.D. Fla. June 12, 2024)

86. J.G. and A.M. allege Defendant had continuous business relationships with J.G. and A.M.'s traffickers due to a prior and ongoing sex-trafficking history, which they indicated was the reason they returned to this Days Inn to traffic J.G. and A.M. (paragraph 35(i)-(l))

87. By alleging that Defendant had knowledge that J.G. and A.M.'s traffickers were trafficking them; by alleging that they had created policies to make this Days Inn sex-trafficking-friendly; by alleging that they had provided support services to their traffickers (in support of their trafficking); and by alleging a continuous business relationship with their traffickers, J.G. and A.M. have sufficiently alleged that Defendant participated in a venture with their traffickers.

c. **<u>Element 3: Defendant's Venture with J.G. and A.M.'s Traffickers Violated the TVPRA.</u>**

88. To establish the third element of a beneficiary claim under § 1595, J.G. or A.M. must allege that the Defendant had at least constructive knowledge that the venture "violated the TVPRA," in some capacity. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 725.

89. Although the venture does not have to be even primarily a sex-trafficking venture, it must violate the TVPRA in some way. *Northbrook* at 20.

90. As alleged throughout Part III, above, Defendant was in a venture with J.G. and A.M.'s traffickers, and Defendant knew they were sex-trafficking at this Days Inn.

91. Based on the indicia alleged in paragraphs 33-37, above, Defendant had at least constructive knowledge that J.G. and A.M.'s traffickers were sex trafficking at this Days Inn during J.G. and A.M.'s dozens of stays each year

of the trafficking period.

92. Additionally, paragraph 35(a)-(l) indicate Defendant had *actual knowledge* that J.G. and A.M.'s traffickers were engaged in trafficking based on the many examples of personalized support they provided to them in furtherance of their trafficking.

93. Whether the venture between J.G. and A.M.'s traffickers and Defendant was a hotel room renting venture with elements of sex trafficking, a sex trafficking venture, or an entirely different kind of venture, what matters is that Defendant had at least constructive knowledge that when they provided their traffickers with personalized services and then continuously rented rooms to them, they established a venture with them that knowingly included sex-trafficking at this Days Inn, and Defendant had at least constructive knowledge of same, as alleged throughout paragraphs 33-37, above.

**d. <u>Element 4: Defendant knew the Venture Violated the TVPRA.</u>**

94. Under § 1595, constructive knowledge that the venture violated the TVPRA only requires that the hotel knew or should have known *someone* was being trafficked at the hotel, not specifically J.G. or A.M. *Northbrook* at 22 ("We agree beneficiaries must know that a person was trafficked, and there is no such thing as a 'general violation' of the TVPRA … But we do not agree … that beneficiaries must know the identity of the trafficking victim.").

95. Throughout paragraphs 33-37, J.G. and A.M. have alleged Defendant was aware that J.G. and A.M.'s traffickers were sex trafficking at this Days Inn during throughout the trafficking period.

96. Throughout these same paragraphs J.G. and A.M. have alleged that Defendant was aware of myriad indicia of trafficking; they have alleged that Defendant created policies making Days Inn a sex-trafficking friendly hotel; they have alleged that Defendant provided J.G. and A.M.'s traffickers with personalized services in furtherance of their trafficking: Defendant was clearly at least constructively aware J.G. and A.M. were being trafficked.

97. Because it would be impossible for Defendant not to be aware of sex trafficking at Days Inn, including J.G. and A.M.'s sex trafficking, as alleged, J.G. and A.M. have satisfied this element.

WHEREFORE, Plaintiffs J.G. and A.M. demand judgment for damages against Defendant, SHREE SAINATH HOSPITALITY, LLC, in an amount in excess of Fifty Thousand Dollars ($50,000.00), costs, interest, attorneys' fees, if allowable by law, and such other and further relief as the Court deems just and proper, both in law and in equity. Plaintiffs further demand trial by jury as to all issues triable as a matter of right to a jury.

## CAUSATION AND DAMAGES

98. Plaintiff, J.G. and A.M., were harbored at Defendant's hotel where they

were seriously and permanently injured as a direct result of the Defendant's acts and omissions, in that the Defendant knowingly permitted, harbored and facilitated illegal sex trafficking ventures to take place at the Defendant's hotel whereby Plaintiffs, J.G. and A.M. were routinely and continuously abused, battered, falsely imprisoned, raped, beaten, starved, forcibly injected with drugs and enslaved.

99. Under the TVPRA, Defendant is jointly and severally liable for all damages a jury awards to J.G. and A.M. for past and future losses they suffered as a proximate result of their sexual exploitation and trafficking.

100. More specifically, at all material times, in the quest for profits, the acts and omissions of the Defendant caused the Plaintiffs to suffer:

a. Forced labor;

b. Forced confinement without safe means of escape;

c. Assault and fear;

d. Illness, dizziness and headaches;

e. Cuts, lacerations, abrasions and other physical harm;

f. Mental anguish, humiliation, exploitation, degradation and mental distress;

g. Suffocation, battery, sexual assault and rape;

h. Shock, fright and post-traumatic stress;

i. Overdose and drug-induced dangers;

j. Forced (sexual) slavery; and

k. Invasion of privacy.

101. As a direct and proximate result of Defendant's acts and omissions Plaintiffs suffered substantial physical, emotional, and psychological harm and other damages.

102. Defendant is jointly and severally liable with Plaintiffs' Traffickers and any other non-party actors who participated in the trafficking for the indivisible injuries that the venture proximately caused to Plaintiffs (should they be brought into this case).

103. Plaintiffs bring each and every claim for damages permissible under the law against the Defendant, who is liable for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and consequential damages permissible under the law, including, but not limited to the following actual past, present and future damages:

a. Personal injuries;

b. Past, present and future pain and suffering;

c. Disability;

d. Disfigurement;

e. Mental anguish;

f. Loss of the capacity for the enjoyment of life;

g. Loss of earning capacity;

h. Lost wages;

i. Direct damages;

j. Incidental and consequential damages;

k. Emotional distress damages;

l. Necessary medical expenses;

m. Life care expenses;

n. Physical pain and suffering;

o. Physical impairment;

p. Attorneys' fees as allowed by law;

q. Costs of this action; and

r. Pre-judgment and all other interest recoverable as a matter of law;

**JURY DEMAND**

104. Plaintiffs, J.G. and A.M., request trial by jury.

WHEREFORE, Plaintiffs pray for a judgment against the Defendant and for the following:

1) That process and summons be issued requiring Defendant to appear as provided by law to answer the allegations of the Complaint;

2) Plaintiffs be awarded actual damages in amounts to be shown at trial;

3) Plaintiffs be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

4) Plaintiffs be awarded their attorneys' fees and case expenses as allowed by law;

5) Plaintiffs be provided with a trial by jury; and

6) Plaintiffs have such other further legal and equitable relief as this Court deems just and appropriate under the circumstances.

DATED this 12th day of October, 2026.

Respectfully submitted,

*/s/ Anthony Chiarello*
Anthony Chiarello, Esq.
Florida Bar No. 73760
Victim's Voice, LLC
**Attorneys for Plaintiffs**
100 N. Federal Hwy, 4th
Fort Lauderdale, FL 33301
Telephone: (754) 355 4700
Facsimile: (954) 994-0040
Primary email: anthony@victimsvoice.law
Secondary email: serita@victimsvoice.law